Final case this morning is Rose v. Array Biopharma, No. 22-1003. Mr. Brown, you may proceed. Thank you. Good morning. My name is Ari Brown. I represent a class member, injector, and appellant, Matthew Pampano. I'd first like to thank the court for taking oral arguments on this case. The measure of class counsel's attorney's fees is not one that gets much attention. Typically, these are uncontested motions where a district court with a full docket is often forced to rely on plaintiff's class counsel for the facts and the law. And we submit that the district court should be comfortable relying on plaintiff's class counsel. After all, they have a fiduciary duty to the class members to put the class's interests above their own. Here, there were some representations to the district court that were not quite accurate. Broadly speaking, there were three errors. The first is that the district court accepted that one-third of the common fund as a fee was common in this circuit. And then it started at one-third, and it ran through the factors in Johnson v. Roadway to simply satisfy itself that there were no reasons for a reduction. And this is rather than... Was that point even raised in district court? Was yes. The 25%? Yes. And Mr. Pampana objected to the use of 25%. I'm sorry, to the use of 33%. Did he provide his own number? I believe he suggested 25%. Now, to be fair, Mr. Pampana submitted his objection pro se. I've looked back. He has raised all the issues. He did not cite cases. But each of the issues that we are proceeding on this appeal were raised sufficient to put counsel on notice. Do you have any binding Tenth Circuit authority that the district court has to start with 25%? That... I think we all agree that Gottlieb v. Barry is the presidential case. It doesn't say that, though. It does not. What it says is, it's cited with approval to the Ninth Circuit use of 25%. It said that was a reasonable place to start because it was awarded 22.5. It's a CF citation to a Ninth Circuit case. Correct. I'm not sure how you get from there to a binding rule in the Tenth Circuit that district courts have to start with 25%. I agree, Your Honor. In the 25 years, 28 years since Gottlieb, though, it has been understood by a number of courts in this circuit who have said that Gottlieb explicitly adopted 25%. Now, I would submit that Gottlieb was not as explicit as the Ninth Circuit would be some eight years later in Vizcano. This case, I believe, is an opportunity to slow down or correct the fee inflation that has occurred since then. So counsel, I appreciate your argument. The problem that I'm having that I hope you can help me with is, in some respects, your brief has sort of a policy quality to it. I'm trying to identify what the legal mistake is. We're on abuse of discretion review. Are you contending that the district court made some sort of a mistake of law in the way that it considered the one-third of the common fund as the fee? And if so, what is that based on? Because it can't be based on Gottlieb because Gottlieb doesn't stand for the proposition you advance. Again, I said there were three mistakes. The second, I think, is closer. And that was in accepting the representation that damages constituted $24 to $34 million. And therefore, this was an excellent result. And in applying the Johnson factors, weighed heavily on that to justify a one-third fee. Now, we know that that $24 to $34 million is incorrect. Because at final approval, there was a declaration from the settlement administrator who showed that some 46,000 notices went out of those, 4,200 were returned. And with just those 4,200, 1,300 were approved. And that resulted in recognized claims of $47.3 million. Well, let me ask you about that. Wasn't $47 million the recognized losses from the claims administrator, Ms. Segura, and not the measure of class damages, which the plaintiff's expert determined to be $34 million? First of all, the plaintiff's expert did not determine to be $34 million. The plaintiff's expert said specifically, all he could do was quantify damages on a class basis. But he could not do so at that point, because quantifying damages would require the completion of discovery. All right. But can you address the distinction between recognized losses on the one hand and class damages on the other? The same way that class counsel did, the recognized losses was the beginning of the measure of damages, which would have to go through a process, which could not be done. But they're not the same thing. They're not, but we don't know what the difference is. And what we do know is that the $24 to $34 million was just sort of speculative. And we know that since 9% of the class members submitted damages with recognized losses of $47, the number is greater. Okay, so I would like to ask you a question about this. So you're no longer contending that market capitalization loss is any kind of a benchmark in this case. You're focused on what the claims administrator was processing as, no. No, I think that's a little overstated. Okay, because it seems that market capitalization loss and investor damages was confused or conflated below. I think it's been confused and conflated below throughout. We don't have any record on what the actual measure of damages are. All we have is counsel's representation that it was a number of $24 to $34. Now, I would contend that the number lays somewhere between the $240 million market cap loss and the whatever would have been submitted had 100% of people submitted claims, which we will not know. Was this argument presented to the district court, the claims administrator argument? It couldn't be because Mr. Pampana's objection came in before any of that record was put in on reply. So that should have alerted the district court, not only that the numbers were off, that the math didn't math, but that the claim that this damage calculation came from the expert was simply not true. I think at the preliminary approval stage, it was incorrect to give those damages at the preliminary approval stage because counsel didn't know, so they got in front of their skis a bit. But at the final approval stage, where counsel already knew that their estimates did not hold water because they were already contradicted, it was wrong and wrongful to tell the court that this is the measure of damages and therefore this is such an excellent result. It was similarly wrong to tell the court that a one-third recovery is common because in all the cases cited to the district court and to this court, there is not a single one that actually awarded one-third. Most awarded in the 25% range or less. A few awarded 30% for reasons that the courts articulated as they walked through the Johnson factors. And I would say the best example of that may be the Veslada case. There, it was a relatively small recovery of $5 million. The plaintiff's counsel had conducted 91 depositions. There were 100 motions. So the court found that increasing the award to 30% was reasonable. That resulted in counsel collecting an average of about $250 an hour, which is, I plugged it into an inflation calculator, is worth about $400 an hour today. And that was a 1.5 multiplier. Can I take you back to your point that the district court wasn't, could not have been made aware of the claim administrator argument? Because your answer struck me as inconsistent with my own recollection. And it seems that in her order, she does say that plaintiff notes that their claims administrator has provisionally accepted $1,300 some claims from class members representing just over $47 million in recoverable losses. Judge Rossman, I believe you asked me if Mr. Pampaina knew about it. Oh, no, I asked you if the district court knew about it. My concern is that this is, that you did not make this challenge in the district court based on the claims administrator. That he had no opportunity to make this challenge. Okay. He did, however... And that's based on the idea of it came up in reply? Yeah. Okay. Now, he did, however, raise the notion that the damages did not, it was already apparent that the estimate of damages was faulty. He didn't have the information. We still don't have the information to specifically say why and to specifically give a damage calculation. But he raised enough to say that this does not appear right. And it was only in reply that we got more information. And it still appears even more wrong. I would say that the other problem is the district court did not look at, did not do a lodestar crosscheck. Now, whether a lodestar crosscheck is required by name or it's really part of the Johnson factors is immaterial. A lodestar crosscheck is pretty much required, whatever you call it. There were a number of red flags that should have arisen from the lodestar crosscheck. What is your authority to support the requirement? I understand that you have an argument about how it was performed, but what is your authority for the requirement? That several of the aspects of the Johnson factors are essentially a lodestar crosscheck. You've got the time and expense required, sorry, time and the skill, which is reflected, I'll back up. The skill and the reputation, which is reflected in the rates, those are two of the Johnson factors. Then you've got the time and the labor required, which are essentially the time records. You put those together, that's a lodestar. Well, I thought the district court did a lodestar crosscheck. Are you arguing that it didn't do one at all or that it didn't do it correctly? I'm saying it could not have done one correctly because it had no time records. The only time records it had were these broad categories that would not be sufficient under any of this court's precedent. It's less than by a third. I'm not sure I heard an answer to Judge Rossman's question. Do you have a case that says that the district court was required to do a lodestar crosscheck? My answer would be that the district court is required to apply the Johnson factors, and within the Johnson factors is essentially a lodestar crosscheck, no matter what you call it. If you say it's an examination of the time and the labor required, that's the time records, and those are two of the Johnson factors. And if you say it's the requisite skill and customary fee and the attorney reputation, which are three more of the Johnson factors, that's reflected in the hourly rates, as the Supreme Court in Blum mentioned. So that is your lodestar crosscheck. Any case that says you must apply the Johnson factors is essentially saying you must perform some sort of lodestar crosscheck. Now, I would say that the court had no records, which is already a red flag. The- Well, it had some records. It had some records, but not records that are in any way sufficient. For example, given the records that it had, the court had no way to determine whether there was duplication of work, whether all billed work was necessary and appropriate, whether work was billed to attorneys that could normally be done by assistance. Those records were simply not before the court, and the court couldn't evaluate them. Now, I would just like to close by taking issue with the fact that class counsel closed their brief by seeking sanctions from Mr. Pampana. Mr. Pampana is a class member. He has not opted out. I think we all recognize that class counsel owe the entire class a fiduciary duty once the case has been filed, and that duty continues through the settlement process and including any appeal. So seeking sanctions from their own client for pursuing an appeal suggests real problems with class counsel's understanding of their role representing the class. If there are no further questions, I see my time is up. Thank you, Counselor. Thank you. May it please the Court, Counsel Nicholas Porrett on behalf of the class, on behalf of the plaintiff and his matter of appellee. Decisions on the awarding of a fee in a class case are properly and appropriately vested in the discretion of the court, the trial court. The trial court has the knowledge of the procedural history, has the in-depth knowledge of the facts of the case, has observed counsel's conduct during the course of litigating the case, is therefore best placed to make a decision as to what an appropriate fee is, acting in its fiduciary duty to protect the class, recognizing that by this stage, fee applications are often not adversarial in the absence of an objection. That's why they're appropriately reviewed by this court under an abusive discretion standard and also explains why there are very few decisions of this court addressing fee approvals because it is such a discretionary standard and rarely appealed. Here, I think there is no question that the court, the trial court here, properly exercised its discretion in awarding this fee, taking into account the standards of this court set forth in Gottlieb and properly applied the Johnson factors. If you look at what is required to show an abuse of discretion, it requires either a legal error, a clearly erroneous factual finding, or no rational evidentiary basis. Now, the court wrote a 32-page opinion, magistrate judge wrote a 32-page opinion, of which approximately 10 pages are devoted to discussing the fee. So the third category is out in terms of abuse of discretion. I understand from my friend's argument today, he's not arguing legal error, the legal standards were correctly identified and applied by the court. So we're down to clearly erroneous factual findings. And even there, there was a substantial record justifying every one of the findings. Well, one argument he makes in his brief is that the 33%, the one third, is in, as he put it, stark contrast to other awards in this circuit. Is that correct? Your Honour, I would submit no, it's not. We've cited in the brief numerous cases where 33% has been approved at the district court level, or even by this court level. This court in Huya, H-U-I-E-R, approved a 33% award. Other courts have awarded, they were cited either in the cases or in the survey of cases, cited, there's the Cimarron case, 33.6%. Molencourt was 30%. That was cited by a case. Public Services, 33.4%. United Telecom, 33%. And the cases also cite, courts routinely cite the fact that 33 and a third percent is a common fee. That was also cited, this court in Brown noted that fees are commonly awarded at the 23.7 to 33.7% range. The court in Luckin noted 33% was common. The court in Vassilavik noted 20 to 50% is the range. Thornburgh, the case noted 30 to 40% is frequently the range. So I think the record is clear that 33 and a third percent is common. Now, does it mean 51% or not? What common necessarily means, I'm not sure, but 33% is certainly frequently awarded. It is not unusual for 33 and a third percent to be awarded. Could you help sort out, there's a lot of numbers being thrown around, but the ones I'm particularly interested in, we have the 240 million market capitalization, we have 47 million recognized losses, then we have 24 to 34 billion classified damages. Could you give us an explanation of how those numbers fit together? Happy to, Your Honor. So I'll start with the 241 million, which is the market cap loss. As the Supreme Court has established in the Dura case, market cap losses are not fully recoverable on behalf of investors during securities class action because there's a significant element of the claim is loss causation. So you have to show you're only entitled to the loss, the market capitalization loss that is caused by the alleged fraud. So the 240 million market cap loss is a crude measure when you initially look at a particular class, allegations of the class period, just alleges what happened to the stock price during the course of the class period. It's basically number of shares multiplied by some of the drops. It has no sophisticated analysis as to trying to, you would have 240 million market cap loss even if the market itself lost 50% of its value during that period, but for no reason whatsoever to do with the fraud. So it is announced at the very beginning of the case, often when you put out a, you're required to put out a notice when a case is filed, you are required under the PSLRA, Private Securities Litigation Reform Act of 1995, to put out a notice saying that a case has been filed to make potentially plaintiffs aware of the opportunity to file, to run the case. In that notice, you typically put in the market cap loss because that's really all you've done at that particular point in time, but it's not a relevant measure for, it's not a relevant measure for actually evaluating damages or valuing for a settlement. It is not contained in the notice. The preliminary number, which is the number that was put, used to develop the notice. My friend criticized us putting in that number at the preliminary approval stage. We are required by statute to include a preliminary damages number at the preliminary notice stage, preliminary approval stage, because it has to be included by statute in the class notice, which the court approves at the preliminary approval stage. So at preliminary approval, you have to run an estimate. Because damages are complex, you inevitably run a model. So the 24 to 34 million, you get a range. You run trading models, you try and estimate the number of actual damaged shares. So that is shares that were purchased during the class period and then held over the relevant corrective disclosure where the stock price dropped as a result of the fraud. That is what generates the 24 to $34 million number. People who bought before the class period, for instance, and held throughout, they're not entitled to any damages because they're not included in that number. People who bought and sold before there was a corrective disclosure are not entitled to damages under the Supreme Court decision in Dura and so are not included. So that's the 24 to $34 million number. That's the range. And that's what we use in the class notice. Finally, the 47 million is the recognized losses, which occurs after the notice is issued. And the suggestion, and so 46,000 class notices were issued. The suggestion that only 9% of the class of the people with damages has responded is just incorrect because many of those people who've received notices, those are mailed out based upon, they're mailed out to all the brokers, basically, that do trade public securities in America. They give you a notice of people who mail traded a raised stock during the class period, but they may have bought and sold them in the class period and therefore have no damages. That's apparent from the notice. It's clear they're not gonna have a claim to the settlement fund, so they don't file a response. So it's not an indication that there's somehow 91% of potential damages out there. That's not the case. In fact, 9% is fairly standard, I would say, in terms of response rate. The fact that it came in at 47 million, so that's the recognized losses. That is a better evaluation of the damages. It's not something we knew at the time of the preliminary approval. Is it accurate to say that that would typically then be an inflated number as far as damages, class damages? The recognized losses, Your Honor? Yes. No, it's not an inflated number. I would say it's a more, when you run the estimate, that has came here for 24 to $34 million, you run, our expert ran models and suggested it's just counsel speculation. It's just flatly incorrect. There's no basis for that in the record. We consulted with our expert, who's got a PhD in economics and finance. They run this model which tries to estimate who really bought and sold shares during the class period. So you can look at the raw volume. You have the numbers reported every day of the volume of shares. You have a model as to who is actually trading in that volume number. And that comes up for the 24 to $34 million. When you run the class notice period, you actually go out and ask people who actually traded and they respond with the actual trade data. So that data was always gonna be, that's not available to you at the preliminary approval stage and it's not, it's the best, so it gives you actual trade data. So it's gonna be a slightly more robust number. And sometimes it's more than recognized. Sometimes it's less than what you model because your response rate isn't so good. Sometimes it's higher. 47 million compared to 34 million, frankly, is fairly close considering the estimates and the modeling that's required. But that's almost, it's almost beside the point. Because even if you take 47 million, which is probably the best estimate of damages here, the settlement is 18% of that total damages, recoverable damages, which as is uncontested by Mr. Pampaina, is double what normal settlements in the class actually feel for the sort of size are. So Cornerstone does a survey, which we presented to the court. Settlements for cases of this sort of size, typically about 7.6%, between 5.3 and 7.6% of damages. So even taking the 47 million number, at 18%, that's over double that, which under any test is an excellent result for the class. Which is really what we're getting at here, when it turns out to, when you're assessing the overall, what the fee should be. Because the proper test under Gottlieb, and then ultimately under the Johnson factors, is was this a good result for the class? What were the potential damages and what was the overall recovery? And here, even 18% is an excellent recovery for the class. I would also point to the affidavit submitted to the district court by retired Judge Lane Phillips, who I would describe as probably the preeminent mediator for securities class actions. Another complex litigation and class actions in the United States, who also described it as an excellent recovery, or significant recovery for the class. So on an abuse of discretion standard, there was no doubt that the finding by the district court, that this was an excellent recovery for the classes, is not arbitrary, it's not lacking any rational evidentiary basis. It is solidly reported by the record. And Mr. Pampona just doesn't provide any alternative evidence to rebut that. And just on two points, Judge Rossman, you asked counsel whether these were raised at the district court level. The 33%, as a common factor, was not raised by Mr. Pampona, even though it was raised and mentioned in our papers. The argument on the 47 million in damages was mentioned in our reply brief, was submitted to the court in the reply brief, which was given to Mr. Pampona, was served directly on him. He declined to attend the final approval hearing, where he could have presented argument. So to say he wasn't had no opportunity to present the argument is not true. He could have simply, he could have arrived at the court and presented his argument. And in final approval hearings, objectors turn up in person all the time and present arguments. So he decided, I would argue, waived or declined to present that argument to the district court. Could I just ask you, you don't say a lot in your brief about Mr. Pampona's staff attorney argument, which, as I understand it, if staff attorneys were contract attorneys on the case, he's arguing that their hours shouldn't have been included in the fee calculation. Could you speak to that argument? Once again, Your Honor, so I would say that's, again, a matter for the discretion of the district court to need to consider in the circumstances of the case. And the district court is well-placed to judge the work that's required. I think even in his brief, Mr. Pampona admits the courts kind of go left and right on this issue. Sometimes it's treated as an expense to be recovered as overhead. Sometimes that's regarded as improper and it should be included as part of the attorney fee and included in the lodestar analysis. So I think it's a matter which can be, I don't think there's a black line rule that can be declined that should always be one or always the other, because I think it's very much in the circumstances of the case. Bearing in mind, and I think that's also a question that's more relevant when you're doing a lodestar multiplier approach to the fee rather than a percentage of the fund. One aspect of Mr. Pampona's objection here is he essentially asked the court to do a complete lodestar analysis, even when they're applying a percentage of the fee of the fund approach. And that's not what Johnson requires. Johnson requires the facts is to look generally at the time and labor required and the experience of counsel and so on. One of the benefits of the percentage of the fee identified by this court in Brown is that it avoids necessarily work. And in some cases, sometimes there's speculation required by the court in doing this detailed lodestar analysis of is the work duplicate? Is there duplication? Has it been properly assigned? At what level has the work been done? All those sorts of analyses, which are very time consuming by the court. And for some cases, you have to do that because lodestar is really the only way you have to do that. Like say a statutory fee type sort of arrangement or some other cases that Mr. Pampona pointed to. But in the percentage of the fund case, that's not required. I mean, that's just one of the factors that the court considered. The court considered it here duly, properly. And so therefore, we think it supports the overall fee. And the multiplier here, 2.X, 2.8 times, is less than the multiplier that this court approved in Gottlieb, which was over three times. So we cited other cases where three times multipliers are routinely approved and it's within the range. So once again, we don't see that as being a proper objection. Counsel, before your time is expired, could you speak to the appellant's contention that there is something inconsistent about your fiduciary duty as class counsel in your sanctions request? The sanctions request, Your Honor, was really directed to the fact that I don't believe it's inconsistent with our class counsel. We have a duty to the class. The reason that we believe this appeal to be completely lacking in any foundation whatsoever. It completely disregarded the appropriate abuse of discretion standard and it raised no legitimate argument under the District Court below abuse of discretion award in this fee. And the result of this appeal has delayed distribution to the class members while this appeal has been pending. So it's been almost a year that this distribution has now been held up, solely as a result of this fee, by Mr. Pampaina, who owned 300 shares. And so, obviously we don't go in for sanctions. He's entitled to his objections. He's entitled to raise questions about our fee, about the settlement itself. We answered his questions in detail. We engaged in detailed correspondence when his objection first came in. We then filed a detailed reply, which we presented to him. We engaged in further correspondence with him directly and with his counsel leading up to the hearing. So we treated his objections very seriously and provided him as much information as we possibly could. The arguments were heard by the District Court. The District Court decided, and we think the point of the abuse of discretion standard is that it should then move on. That we need to accept these District Court decisions. And so, for them to file this appeal, which I think is completely frivolous, has really harmed members of the class, whilst the money just sits there not being distributed. And so for that reason, we've just raised, I think appropriately, that this Court should condeem the appeal as frivolous and make whatever award it may deem fit in terms of any sanction. But we do not view that as inconsistent with our duty to that. In fact, we maintain our duty to the other class members requires us to do this. Thank you, counsel. Thank you. No extra time. Well, that will complete the arguments this morning. This case will be submitted and counsel are excused. Thank you for your arguments.